**John DOE, Plaintiff,**

v.

**William CASEY, Defendant.**

**Civ. A. No. 82–2016.**

United States District Court,
District of Columbia.

Jan. 16, 1985.

**582**

Mark H. Lynch, Susan W. Shaffer, American Civil Liberties Union Foundation, Washington, D.C., for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., David H. White, Vincent M. Garvey, Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

The plaintiff John Doe claims that after nine years of service with the Central Intelligence Agency ("CIA" or "Agency") his employment was unlawfully terminated because he voluntarily acknowledged to his superior that he had engaged in homosexual practices. Following that disclosure, the CIA Director, William Casey, decided that it was "necessary and advisable in the interests of the United States to terminate [Doe's] employment ... pursuant to section 102(c) of the National Security Act of 1947 [50 U.S.C. § 401] ..."[1]

John Doe asserts that the Director provided no reasons for his decision, thus, rendering him unable to respond to the charges. In his complaint seeking declaratory and injunctive relief, plaintiff alleges that he was deprived of the elements of fundamental fairness, that he was the victim of procedural deficiencies and irregularities arising from the refusal of the Director to supply reasons for his dismissal and a reasonable and fair opportunity to respond to those reasons. He charges that in dismissing him, the Director violated Agency regulations and provisions of both the National Security Act and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. He further charges that the Director violated his Fifth Amendment due process and equal protection rights, his liberty interest, as well as his right to privacy under the First, Fourth, Fifth and Ninth Amendments of the Constitution. The CIA Director is sued in his official capacity.

Plaintiff seeks a judicial declaration that Director Casey abused his discretion, acted arbitrarily and improperly, and violated his rights secured by the Constitution. Injunctive relief, requiring the Director either to reinstate him to his former position, or alternatively, to provide him with a statement of reasons for termination of his employment, and an adequate opportunity to respond to those reasons is also sought.[2]

At the outset, the defendant moved to dismiss Doe's complaint asserting insuffici-

---

1. Letter dated May 11, 1982 from CIA Deputy General Counsel, Ernest Mayerfeld, to Mark H. Lynch, Esq.; Plaintiff's Motion for Summary Judgment, Ex. B.

2. In an amended complaint, filed November 4, 1982 the plaintiff restricted his claim to declaratory and injunctive relief, omitting any claim for monetary relief and back pay.

ency of service of process, improper venue, lack of subject matter jurisdiction, and failure to state a claim upon which relief can be granted. The parties also filed cross motions for summary judgment.

The legal memoranda submitted by counsel were exhaustive, ably presented, and have been fully considered. For the reasons set forth below, the Court determines that this proceeding should not be dismissed and that the decision of the CIA Director to terminate the plaintiff's employment was improper, unreasonable, an abuse of discretion and both procedurally and substantively flawed. The Court also determines that under the circumstances the plaintiff is entitled to declaratory and limited injunctive relief. The proceeding should be remanded to the Agency for further consideration consistent with the conclusions set out in this Memorandum Opinion and the accompanying Order.

## BACKGROUND

The affidavits and statement of material facts presented in the plaintiff's motion for summary judgment stand unchallenged by the Government. They are briefly recounted.

In June 1973, at the age of 17, John Doe began employment with the CIA as a clerk typist. Four years later he was promoted to an electronics technician position, and, in 1978, he was selected for participation in the Agency's upward mobility program. By that time, he had acquired a non-probationary employee status. Throughout his employment he received acceptable performance ratings and there was no dissatisfaction with his work reported by any supervisor.

Doe became aware of his homosexuality in 1976 and his orientation was known to his family and immediate friends. His homosexuality was never publicized and he never made advances toward fellow· employees. During the course of his employment there was no indications that, at any time, he disclosed classified information to unauthorized persons, that he ever engaged in any conduct with any one individual which compromised security with foreign nationals or anyone else, or that his homosexuality disrupted or affected his duties and responsibilities in any manner.

In January 1982, plaintiff voluntarily informed a security officer of his homosexuality. He was then told that he was in violation of CIA regulations; and on February 2, 1982, he was placed on administrative leave. Plaintiff was interviewed extensively about his homosexuality and his risk to security. Later, a polygraph test was administered covering that matter. Doe was advised that his responses to questions on that test were truthful. An Adjudication Report on his case was prepared by the Office of Security and then forwarded to Director William Casey. The Deputy General Counsel of the CIA informed Doe's counsel that homosexuality was not a *per se* ground for dismissal but that it was a security concern which would be evaluated on a case-by-case basis.

On April 14, 1982, a security officer informed Doe that the Office of Security had determined that the "circumstances of his homosexuality" posed a security threat. Plaintiff sought an explanation of the reasons why the "circumstances" posed such a threat; but his request was denied and no further explanation was provided. Doe was asked to resign and he declined to do so. Later, his counsel also sought a statement of the reasons why the determination was made that Doe's homosexuality posed a security threat.

On May 11, 1982, the Deputy General Counsel wrote to plaintiff's counsel that Director Casey "deemed it necessary and advisable in the interests of the United States to terminate" Doe's employment, "pursuant to ... the National Security Act ... § 403(c)." No further explanation was given and Doe received no other statement of reasons. He was placed on administrative leave for the three months prior to his termination. He received full pay but was not required to report for duty.

The plaintiff also was notified that he was obliged to inform the CIA whenever he

applied for a job requiring a security clearance, so that the prospective employer could be informed that the CIA had determined that he was a security threat due to his homosexuality. The May 11 letter, marked the termination of Doe's administrative leave status. All efforts of his counsel to secure both a statement of reasons and a copy of the Adjudication Report from the CIA were denied.

## ANALYSIS

While several grounds for dismissal of the complaint are asserted, only two are considered meritorious and warrant consideration: improper venue and failure to state a claim upon which relief can be granted. Those problems will first be considered and followed by a discussion of the merits.

### A.

**Venue**

The defendant argues that venue is improper in the District of Columbia and, therefore, that this proceeding should be dismissed or transferred to the Eastern District of Virginia where, it is claimed, the CIA Director officially resides. The venue of a civil action involving federal question jurisdiction is governed by 28 U.S.C. § 1391(b); the venue of an action against an officer of the United States sued in his official capacity is governed by § 1391(e). Both sections provide that venue is proper in the judicial district where the defendant resides.

In advancing the improper venue argument, the government was confronted with somewhat of a dilemma because in three earlier proceedings before this District of Columbia District Court, the CIA explicitly and affirmatively admitted to the official residency of the CIA Director in the District of Columbia. Indeed, in those cases, no question or challenge of improper venue was presented in the government's plead-

ings. *McGehee v. Casey,* C.A. No. 81–0734 (D.D.C.1981); *McGehee v. Turner,* C.A. No. 78–2407 (D.D.C.1978); *Jordan v. Turner,* C.A. No. 78–2036 (D.D.C.1978). When confronted with these inconsistencies, the Government's attempts to explain were strained and implausible.[3] Indeed, with respect to the two *McGehee* cases, the inconsistency could not be explained or defended at all. Defendant's Motion to Dismiss or Transfer on the Grounds of Improper Venue at 4, (Motion filed June 8, 1984).

Following argument and submission on the government's motion to dismiss and the cross motions for summary judgment, plaintiff's counsel was allowed to pursue discovery on the question of venue and the CIA Director's official presence in the District of Columbia. The results of that discovery clearly demonstrated that Mr. Casey as the Director of Central Intelligence (DCI) performed a significant portion of his official duties in both the District of Columbia and the State of Virginia. The discovery focused on a 13-month period ending in March 1984. During that period, the DCI spent 226 days in the Washington, D.C. Metropolitan area. Of these, 190 were spent in both Virginia and the District, 32 were spent solely in Virginia and 4 solely in the District. Mr. Casey spent time in the District of Columbia in order to fulfill his DCI duties, his responsibilities imposed by statute and Executive Orders, and his duties connected with his position as a designated member of both the National Security Council and the President's Cabinet.

A review of the Director's statutory functions, permits a reasonable conclusion that he performs a significant amount of his official duties in the District of Columbia. The National Security Act of 1947, 50 U.S.C. § 401 *et seq.* created the CIA and the position of the Director of Central Intelligence. Section 101(a) of the Act establishes a National Security Council. The President, Vice President, Secretary of

---

**3.** Plaintiff's counsel does not urge that the government is collaterally estopped by its admissions but does urge that they are persuasive and convincing evidence to be considered along with the facts secured in subsequent discovery.

State and the Secretary of Defense are members of the Council. Section 403(a) provides that "there is established under the National Security Council a Central Intelligence Agency with a Director ... who shall be the head thereof...." The duties of the Agency and the DCI, set out in section 403(d), establish the CIA as an instrument of the National Security Council. That section together with section 1.5 of Executive Order 12333, 3 C.F.R. 200 (1982), provide that the DCI advise the President and the National Security Council on intelligence matters and coordinate intelligence activities of other government agencies. Further, pursuant to 50 U.S.C. § 413, the DCI is required to keep the congressional intelligence committees fully and currently informed on all intelligence matters. Since 1981, Director Casey has also served as a member of the President's Cabinet.

As a Cabinet officer, advising both the President and the National Security Council, and as an advisor to intelligence committees of the Congress, the DCI resides in the District where both the Cabinet, the Council, and the Congress sit. While the physical facilities of the CIA are located in Virginia, Director Casey's duties in the District are such that he maintains offices at two locations in the District, at the Old Executive Office Building and at the Intelligence Community Headquarters Building.

▓ It is not unusual for public officials to have more than one designated place of official residence. When a public agency undertakes much of its business in a district different from that in which the agency is headquartered, venue is proper in the former district. *Florida Nursing Home Ass'n v. Page*, 616 F.2d 1355, 1360 (5th Cir.), *cert. denied*, 449 U.S. 872, 101 S.Ct. 211, 66 L.Ed.2d 92 (1980), *rev'd on other grounds*, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) *reh'g denied*, 451 U.S. 933, 101 S.Ct. 2008, 68 L.Ed.2d 319 (1981); *Lamont v. Haig*, 590 F.2d 1124, 1128 n. 19 (D.C.Cir.1978) (drawing a distinction between the residence where official duties are performed and the · personal residence of the defendant).

▓ In determining the residence of a public official sued in his official capacity, the test of residence is where official duties are performed. When, as here, Director Casey performs a substantial portion of his duties in the District, although a larger proportion in Virginia, it is appropriate to conclude that the District of Columbia is a proper place for venue. In *Buffalo Teachers Federation, Inc. v. Helsby*, 426 F.Supp. 828, 830 (S.D.N.Y.1976), venue was held proper in a district where a state agency conducted a substantial portion of its business even though the headquarters' location was in a different district.

### Failure to State a Claim

Various grounds are advanced to support the government's argument that Doe's complaint fails to state a claim upon which relief can be granted. The two considered most important are: that because Doe seeks an award of damages the doctrine of sovereign immunity precludes the claim, and; that assuming the Government has consented to be sued by virtue of the Administrative Procedure Act, review of the Director's dismissal action is foreclosed by section 701(a)(1), (2); that the CIA Director is empowered by statute, 50 U.S.C. § 403(c), with unreviewable authority to terminate an employee and that the decision is committed by law to agency discretion.

▓ The argument that sovereign immunity bars the plaintiff's claim is flawed and misplaced. In 1976, the APA was amended, and the "Right of review" provision, 5 U.S.C. § 702, authorized non-monetary relief against a federal agency or officer. The section provides in relevant part

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer ... thereof acted or failed to act

in an official capacity or under color of legal authority shall not be dismissed nor relief ... denied on the ground that it is against the United States....

In this proceeding the plaintiff does not pursue a monetary claim, but rather, Doe requests declaratory and injunctive relief, specifically, a judicial declaration that Director Casey abused his discretion in dismissing him and a determination that the Director violated his procedural rights. The plaintiff also seeks either reinstatement or, alternatively, a statement of reasons for his dismissal and a full opportunity to respond to those reasons. He relies upon 28 U.S.C. § 1361 which grants relief in the nature of mandamus to compel a federal officer to perform a duty owed to a plaintiff. When read together, section 702 of the APA and section 1361 of Title 28 may be considered as statutory waivers of sovereign immunity. At this point in time, it can scarcely be contended that when a government official is charged with superseding his or her authority the doctrine of sovereign immunity may be invoked.

But more importantly, the argument that the doctrine of sovereign immunity bars the plaintiff's efforts has been undermined and discredited by two recent decisions of our Circuit Court, *Clark v. Library of Congress*, No. 83–1510 (D.C.Cir. Dec. 11, 1984) and *Dronenburg v. Zech*, 741 F.2d 1388 (D.C.Cir.1984), *rehearing en banc denied*, 746 F.2d 1579 (D.C.Cir.1984). In *Clark*, the plaintiff sued the Library of Congress, his former employer, seeking reinstatement as an employee, and an injunction prohibiting any further investigation of his political beliefs and associations which led to his leaving the Library. He charged the Library with violations of his First Amendment rights. He also sought compensatory and punitive damages. The Court of Appeals held that while sovereign immunity barred any relief for damages it was no obstacle to a claim for reinstatement, correction of his personnel records and an injunction against infringement of constitutional rights. The matter was reversed and remanded to the district court for consideration on the plaintiff's claims for spe-

cific non-monetary relief. *Dronenburg* involved a naval petty officer's challenge to his administrative discharge for homosexual conduct and a claim that his constitutional rights to privacy and equal protection of laws had been violated. The Navy raised threshold questions—lack of subject matter jurisdiction and sovereign immunity, contending that plaintiff's complaint was essentially one for damages that should be pursued in the Court of Claims under the Tucker Act and, therefore, that the District Court lacked jurisdiction.

In rejecting the government's argument, the Circuit Court noted that "5 U.S.C. § 702 was intended to waive the sovereign immunity of the United States in suits for injunctive relief," 741 F.2d at 1390. "We are further bound by another decision of this court holding that 'the United States and its officers ... are [not] insulated from suit for injunctive relief by the doctrine of sovereign immunity.' *Schnapper v. Foley*, 667 F.2d 102, 107 (D.C.Cir.1981), *cert. denied*, 455 U.S. 948, 102 S.Ct. 1448, 71 L.Ed.2d 661 (1982)." *Id.* In discussing the legislative history of section 702, the *Schnapper* court noted

> The legislative history of this provision could not be more lucid. It states that this language was intended 'to eliminate the defense of sovereign immunity with respect to any action in a court of the United States seeking relief other than money damages and based on the assertion of unlawful official action by a federal official....' S.Rep. No. 996, 94th Cong., 2d Sess. at 2 (1976).

*Schnapper*, 667 F.2d at 108.

**B.**

In reviewing Director Casey's actions, the basic inquiry is whether the plaintiff was afforded procedural due process— namely: was he given adequate notice of the agency action, was he informed of the rationale of the agency's final decision or at least a statement of reasons; was he given an opportunity to respond or to comment or was he given a hearing where he could address the agency's rationale and

present his position and defenses? *See Nat'l Ass'n of Recycling Industries v. Interstate Commerce Commission*, 627 F.2d 1328, 1334 (D.C.Cir.1980) *vacated in part, consolidated Rail Corp. v. Nat'l Ass'n of Recycling Industries, Inc.*, 449 U.S. 609, 101 S.Ct. 775, 66 L.Ed.2d 776 (1981). The answers to these questions as reflected in the record show that plaintiff Doe was not afforded such opportunities and indeed, at no time was there a recognition of such rights.

In failing to observe even the most minimal due process procedures, the CIA failed to acknowledge and follow its own regulations. When Doe was terminated in May 1982, he was a non-probationary career employee. By virtue of that status he was entitled to various procedural safeguards before the agency made a final decision to terminate his employment.

At the time, a controlling document—Headquarters Regulation—was in effect within the CIA. Section HR 27 of the Regulation entitled "Separation By The Agency," spelled out the procedure to be followed when termination of a non-probationary employee was involved. Sections HR 27b–i dealt with eight grounds for involuntary separation. None of these grounds related to an employee's sexual activities. Section HR 27e provided for termination of an employee because of failure to meet standards of conduct. But no regulation established a standard relating to sexual conduct or matters. The matters covered related only to conflict of interest, acceptance of gifts and decorations, and participation in riots and civil disturbances.

While 27m[4] permitted exceptions when the procedures were "impractical or undesirable" and when the DCI "considers it necessary or advisable in the interests of the United States," subsequent sections provide that an employee be given reasons for the proposed actions and an opportunity to respond orally or. in writing, HR 27m(2), and an opportunity for final appeal to the Director, HR 27m(4). The plaintiff contends that he was not afforded any of the benefits or safeguards conferred by the Headquarters Regulation.

■ When a government agency promulgates and establishes regulations conferring procedural due process rights on its employees, it must adhere to its promulgated rules to avoid any injustice even though they may not be statutory or constitutional requirements. *Bartholomew v. United States*, 740 F.2d 526 (7th Cir.1984); *Mazaleski v. Treusdell*, 562 F.2d 701, 719 (D.C.Cir.1977); *Doe v. Hampton*, 566 F.2d 265, 281 (D.C.Cir.1977). Those appellate rulings adhere to long-recognized Supreme Court precedents. *Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). "An executive agency must be rigorously held to the standards by which it professes its actions to be judged. Accordingly, if dismissal from employment is based on a defined procedure ... that procedure must be scrupulously observed." *Vitarelli*, 359 U.S. at 546, 79 S.Ct. at 976 (Frankfurter, J., concurring in part and dissenting in part).

Moreover, within the context of the specific facts presented in this proceeding—concerned with homosexuality and federal employment, rulings from this Circuit support Doe's claim that he was entitled to invoke and rely upon the procedures prescribed by the CIA Headquarters Regulations. On more than one occasion our Appeals Court has ruled that when a federal employee is dismissed for reasons associat-

---

**4.** The language of HR 27m tracks almost verbatim the provisions of 50 U.S.C. § 403(c). That statutory provision provides that the Director "may, in his discretion, terminate the employment of any ... employee ... whenever he shall deem such termination necessary or advisable in the interests of the United States...."

While section 27m provides that an employee "may be separated immediately and without regard to any suggested procedural steps when the Director ... considers it necessary or advisable in the interest of the United States" the immediacy and urgency of Doe's employment status is belied by the fact that his voluntary disclosures were made in January 1982, but it was not until five months later—May 1982, that the Director decided to fire him.

ed with homosexuality he is entitled to fair treatment and should be afforded all available and prescribed procedural safeguards. *Ashton v. Civiletti*, 613 F.2d 923 (D.C.Cir. 1979); *Matlovich v. Secy. of the Air Force*, 591 F.2d 852 (D.C.Cir.1978); *Norton v. Macy*, 417 F.2d 1161 (D.C.Cir.1969).

The facts in *Matlovich* were not remarkably different than those which plaintiff Doe confronted. An Air Force serviceman, after 12 years of service, acknowledged his homosexual preferences to his superiors. Air Force regulations permitted exceptions to the general policy of discharging homosexuals and, in fact, such individuals had been retained in the past. In discharging Matlovich, the Air Force provided no statement of reasons why the exception was not invoked.

Because the Air Force Secretary failed to supply reasons and further explanations, his actions were determined to be unlawful, arbitrary and capricious. In reversing the district court and remanding the matter to the Air Force for proper consideration, the Appeals Court ruled "the absence of any reasoned explanation in this particular case—makes it impossible to decide whether or not there has been an abuse of discretion in this instance or whether improper factors have played a material role," 591 F.2d at 856. At a further point, the Court was even more explicit:

> The normal rule where a discretionary administrative decision is to be reviewed by a court (other than on a *de novo* basis) is that the agency must give sufficient indication of the grounds for its exercise of discretion that the reviewing tribunal can appraise that determination under the appropriate standards of review (and the applicant for relief can challenge it). This basis concept has been reiterated time and again—in differing formulations and contexts *but always centering on the need for the court, and the complaining party, to be given some helpful insight into the agency's reasoning.*
>
> *The fundamental principle of reasoned explanation embodied* in these

(and comparable) decisions serves at least three interrelated purposes: enabling the court to give proper review to the administrative determination; helping to keep the administrative agency within proper authority and discretion, as well as helping to avoid and prevent arbitrary, discriminatory, and irrational action by the agency; and informing the aggrieved person of the grounds of the administrative action so that he can plan his course of action (including the seeking of judicial review).

*Id.* at 857 (emphasis added; citations omitted). But aside from the problem of homosexuality presented in this proceeding, our Court of Appeals has consistently recognized that while deference should be afforded to an agency's interpretation and implementation of its regulations, it nonetheless must supply adequate reasons for its decisions. *Moon v. United States Department of Labor*, 727 F.2d 1315 (1984). "[A]n agency must provide a reasoned explanation for its actions and articulate with some clarity the standards that govern[ ] its decisions." *Id.* at 1318, citing *Matlovich*, 591 F.2d 856–61.

### 1.

In justifying his actions the Director relies principally upon section 102(c) of the National Security Act. The section authorizes termination of a CIA employee and provides in pertinent part:

> Notwithstanding the provisions of [Section 652 of Title 5], or the provisions of any other law, the [DCI] may, in his discretion, terminate the employment of any officer or employee ... whenever he shall deem such termination necessary or advisable in the interests of the United States.

50 U.S.C. § 403(c).

A review and analysis of this provision presents troublesome and unresolved questions of statutory review. Counsel for the CIA argues with assurance that the plain language of the statute establishes that the decision to terminate an employee is committed to the uncontrolled discretion of the

DCI and that in the absence of any statutory limitation, his exercise of discretion is unlimited and intended by the Congress to be unreviewable. He further contends that there is no procedural requirement that Doe be supplied with a statement of reasons explaining his termination because neither section 102(c) of the National Security Act nor section 27m of the Headquarters Regulation require the DCI to give such a statement. To support these arguments, the CIA's counsel relies confidently upon several Circuit and Court of Claims decisions which subscribe and adhere to the exact language of the statute. *Torpats v. McCone*, 300 F.2d 914, 915 (D.C.Cir.1966), *cert. denied*, 371 U.S. 886, 83 S.Ct. 182, 9 L.Ed.2d 121 (1962); *Baker v. United States*, 650 F.2d 288, 224 Ct.Cl. 760, 761-62 (Ct.Cl.1980), *cert. denied*, 450 U.S. 1040, 101 S.Ct. 1757, 68 L.Ed.2d 237 (1981); *Rhodes v. United States*, 156 Ct.Cl. 31, 37 *cert. denied*, 371 U.S. 821, 83 S.Ct. 39, 9 L.Ed.2d 61 (1962); *see also Kochan v. CIA*, C.A. No. 2728-58 (D.D.C. May 20, 1958).

However, it has long been established that language conferring such discretion does not in and of itself preclude preview. And even if the argument is accepted that the DCI has broad discretion under section 403(c), judicial review cannot be denied where there is a claim that discretion has been abused. Section 706(2)(A) of the APA, was intended to and unmistakably provides for such review when agency action is excessive. In the language of the statute, judicial review is appropriate when action has been "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Moreover, it should be noted that section 701(a)(2) of the APA, upon which the government relies, has been narrowly interpreted by the courts as well as by authoritative commentaries.[5] *Citizens to Preserve Overton Park v. Collins*, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970); *U.S. Lines, Inc. v. Federal Maritime Commission*, 584 F.2d 519, 525 (D.C.Cir.1978); *Adams v. Richardson*,

480 F.2d 1159, 1161-62 (D.C.Cir.1973); B. Schwartz, *Administrative Law* at 610-11 (1976); K.C. Davis, *Administrative Law of the Seventies* § 28.19 (Supp.1980).

▪ Finally, section 102(c) of the Act says nothing about judicial review nor does its language suggest in any way that courts are ousted from reviewing agency action. To determine whether a statute precludes judicial review, courts are bound to recognize that the APA affords a "basic presumption of judicial review" that "will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The Supreme Court addressed this subject during its last term in *Block v. Community Nutrition Institute*, —— U.S. ——, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), and held that "specific language or specific legislative history," "contemporaneous judicial construction barring review and congressional acquiescence in it," "the collective import of legislative and judicial history behind a particular statute" or "inferences of intent drawn from the statutory scheme as a whole" may overcome the presumption of reviewability. 104 S.Ct. at 2456. None of these factors are present with respect to section 403(c). In the absence of such, the DCI's exercise of discretion must be set aside as arbitrary, capricious, and as a denial of procedural due process.

## CONCLUSION

▪ The Court is not unmindful of the position occupied by and the role played by the CIA in accomplishing its statutory mission. The Court is also aware that because of the facts and sensitive nature of some Agency personnel decisions, they should be shielded from full public scrutiny. But the record at this point does not reflect or even suggest that overriding national security concerns are at stake or that affording the

---

**5.** Section 701(a)(2) provides for an exception to the extent that "agency action is committed to

agency discretion by law."

plaintiff Doe the relief he seeks, might disclose matters that would place at risk such concerns and interests. In sum, the state of this record does not support the government's position that the DCI should have carte blanche authority and limitless discretion, free of judicial review.

This opinion does not address the several constitutional claims pressed by the plaintiff. Those claims present difficult and unsettled issues of law, made even more uncertain by shifting views of appellate tribunals. Because of the stated reasons and bases upon which it is determined that relief should be granted to the plaintiff on other grounds, the Court foregoes at this time a discussion and review of his constitutional claims.

The plaintiff is entitled to his procedural due process rights as provided by the Agency's regulations, statutory authority and judicial precedent. Pending the granting of such rights he should be reinstated to the administrative leave status that he held before he was terminated by the DCI, *supra,* p. 584.

### ORDER AND JUDGMENT

On basis of the Court's Memorandum Opinion filed on this date, it is

### ORDERED

That the motions of the Central Intelligence Agency to dismiss the plaintiff's complaint and for summary judgment are denied;

That the plaintiff's motion for summary judgment is granted on the grounds that he was denied and deprived of procedural due process rights, and judgment is entered for the plaintiff;

That the plaintiff shall be afforded all procedural due process rights as provided in the Court's Memorandum Opinion of this date;

That the Director of the Central Intelligence Agency is enjoined to reinstate the plaintiff Doe, within 30 days from the date of this order, to the administrative leave status formerly occupied by plaintiff, until

such time he is granted procedural due process.